Okay, we'll call the next case. And that's the last case for today. Fennell v. Marion Independent School District. Mr. Robert Pitard. May it please the court, my name is Chris Pitard and I represent the appellants in this case, Kiana, Kiriana, and Kaven. During the events in the spring of 2012, Kiana was a senior in high school, Kiriana, also known as Kira, was a freshman, and Kaven was a 7th grader. This would appear to be a case of first impression before the 5th Circuit in that this court has not ruled on a case where a Title VI claim has been brought against a school district along with an equal protection in Section 1983 claim that asks the question of whether the school district took appropriate action, reasonable action, in responding to complaints of racial harassment by students. The standard has been established through the Office of Civil Rights, 1994 Racial Harassment Guidance, Davis v. Monroe County Board of Education, 526 U.S. 629, and Montiero v. Tempe Union High School District, 158 F. 3rd 1022, a 9th Circuit case from 1998. In order to establish a Title VI claim of discrimination, the entity first must be a recipient of federal funds. First, after that, the harassment has to be so severe or pervasive or objectively offensive as to deprive the plaintiffs of access to the educational opportunities or benefits provided by the school. The school has to have actual knowledge of the harassment, and then the district was deliberately indifferent to the harassment, and deliberately indifferent has been defined as the district's response was clearly unreasonable in light of the known circumstances. In this particular case, the time frame for the incidents of which appellants complained is between 2008 and 2012. In 2008, Kira received text messages with images of KKK and swinging nooses. This is soon after President Obama was elected, and she responded by retaliating against the individual. She was suspended for three days. There were other text messages calling her a stupid nigger, and that continued along those lines between her, her sister, and her younger sister. The appellees would like the court to look at each incident as an isolated incident rather than a total or the totality of the circumstances. These sisters lived together, and over that four-year period of time, they all experienced some level of racial harassment, particularly with the word nigger. As the court held in Monteiro, the use of the word nigger by white classmates toward a black student or even to other black students is sufficient to create a racially hostile environment, and we have evidence of that level of racial harassment in this case. In fact, in its order, the district court found that there was a racially hostile environment under Title VI to meet that element of the claim, that the appellants were deprived of the same opportunities as their classmates. In particular, Kiana, after the February 6, 2012, Noose and Note incident, didn't feel safe any longer and requested that she continue her studies in the counselor's office. Kaven was exposed to high school students throwing taunts and racial epithets in her direction as she walked from the middle school to the high school, and the court needs to know that the Marion ISD is not a large independent school district and that the middle school and the high school are co-located together. So when Kaven needed to walk from the middle school to the high school, she was subjected to taunts and epithets that were tossed her way by high school students, which required an escort by a teacher until she finally withdrew from school a month later. The trial court found that this harassment had deprived her also of these educational opportunities. So the first element was met as far as the trial court was concerned. Second, the trial court determined that the district had actual knowledge of the complaints, of the harassment, because of the complaints, that the parents of these three students complained vociferously on many occasions and eventually filed 11-1 grievance in January of 2012 about what they perceived as racial harassment and discrimination. But over the years, the parents and the students had been complaining to various administrators and teachers about what they had been experiencing in the various classrooms from both middle school and high school. So the trial court determined that the district did have actual knowledge. However, the trial court found that the district's responses were reasonable under the circumstances to remedy the harassment that the appellants endured. But the trial court further opined that the fact that the harassment continued and that it was perpetrated by different individuals appears to this court to be more reflective of some of the students and that these unfortunate events are isolated incidents reflecting the bigoted views of a few individual students rather than the culture of Marion as a whole. The court further held that similarly the fact that there were reported or repeated incidents of racial harassment does not appear to stem from any deliberate indifference on the part of Marion. Because as a public school, Marion cannot control who it is bound to educate and when racist attitudes are already ingrained in a segment of the students it serves, Marion has an obligation to take reasonable steps to eliminate the racially hostile environment and Marion has done so. Now this passage from the trial court's order is instructive because it acknowledges that the harassment continued even after Marion took reasonable measures. That the racist attitudes seem to be already ingrained in a segment of the students that the district serves. But in contrast, the court found that the incidents reflect the bigoted views of a few individuals that do not reflect the culture of Marion. Well that seemed to be inconsistent. Either the racist attitudes are already ingrained in a segment of the students or it's just a few bigoted individuals. And if it is ingrained in a segment of the students, that very well may be reflective of a racist culture in Marion and Marion ISD. So the appellants would argue then that as the court in Vance v. Spencer County Public School District 231F3-253, a Sixth Circuit case from 2000, that if a school district has actual knowledge that its efforts to remediate the harassment are ineffective and it continues to use those same methods to no avail, such district failed to act reasonably in the light of the known circumstances. Therefore, the district can be determined to be deliberately indifferent. The trial court in this case admits that the harassment continued even after the reasonable measures taken by the district. Appellants then would argue that based on Vance, that the ineffective efforts of the district amounts to deliberate indifference. Because the racial harassment continued and eventually appellants had to withdraw from the district. We're not saying that the district did not take some measures because at times they would have parents talk to their students or they would talk to their students or they would suspend a student after one of the appellants had retaliated. They would suspend both of them. There was no instance where they suspended a student merely for calling one of the appellants nigger. That never happened. The only time any student was suspended was after that student retaliated against the person who called him that word and then both students were suspended. But never was one student suspended only for using that word. And that I think goes to the core of the lack of reasonableness of the district's measures to try to control this situation. We believe that that's why they were clearly unreasonable because they did not go to the core of the problem. The core of the problem was racist attitudes within the district and they were not addressing them. When they finally did address them was after the appellants had withdrawn from the Marion ISD. That's when the Department of Justice and the NAACP conducted training. But even then the district school board refused to sign off on any proclamation afterwards that might somehow set them up for liability. So even then after the DOJ and NAACP come in to conduct training, the school board is still reluctant to sign off on any kind of proclamation about them having done better when it came to dealing with racial harassment and racial discrimination issues. Equal Protection and Section 1983. Particularly against the district. In order to state a claim against the district under 1983, the appellants must be able to show that the discriminating conduct was a result of an official policy or that the discriminating conduct was so pervasive that it implies that there was a custom or unofficial policy promoting racial discrimination. Appellants concede that there is no official policy by Marion ISD that there should be racial discrimination. That it would be foolish to try to assert that. What we assert then is that the incidents over a four year period are more than just isolated incidents. In contrast to the case in Doe v. School Board of Broward County, 604 F. 3rd, 1248 11th Circuit case. But that there is a persistent and widespread pattern of unconstitutional conduct of which the school officials have noticed and subsequently react with either deliberate indifference or tacit authorization. And when that occurs, there is a violation of equal protection rights under Section 1983. That's what the 8th Circuit held in Schrum v. Kluck, 249 F. 3rd, 773, 2001 case. Again, using a standard from Vance, if the remedial actions by the district are ineffective, then the district can be found to be deliberately indifferent. In addition, the district failed to train its teachers and administrators on how to deal with issues of racial harassment. There is no evidence of periodic or regular training in that area, not until the Department of Justice and the NAACP got involved. And even then, the school board refused to sign off on the proclamation following the training. In Flores v. Morgan Hill Unified School District, 324 F. 3rd, 1130, a 9th Circuit case from 2003, the court held that the district's failure to train teachers, students, and campus monitors about district policies prohibiting harassment on the basis of sexual orientation could allow a jury to conclude there was an obvious need for training and that the discrimination based on sexual orientation was a highly predictable consequence of the districts not providing that training. We would say the same here. The record is replete with situations involving teachers where they allowed the use of the word nigger in their class. Regardless of the context, even if it was after the reading of Huckleberry Finn, which was the basis for the Monteiro case, even if it was in that context, if the teacher doesn't give a context to the use of that word and students are continuing to use that word in class, then that's going to create a racially hostile environment. That one word by itself can create that kind of environment. These sorts of things went on and on with teachers, making jokes, saying things like all blacks are on welfare, so forth and so on, over and over again, over this four year period of time. I see I'm about out of time. I would like the court to reverse the trial court's granting of summary judgment because there are genuine issues of material fact on these two claims and allow the appellants to take this case to a jury. Thank you, sir. May it please the court. I am Stacey Castillo and I represent the defendants, Marion Isd, Glenn Davis and Cindy Manley, in this case. This case boils down to what actions the district took when it was notified of racial harassment and whether those actions taken were deliberately indifferent, or in other words, whether the actions taken were clearly unreasonable in light of the known circumstances. The record in this case is replete with evidence that the district took actions on each instance of known or reported harassment, and the record reflects the district's active efforts were appropriate and effective as to each allegation. I want to point to the court that the Finnells rely heavily on several unsubstantiated allegations in their briefing. Many times they say that nothing was done or no action was taken, when in fact their record reference to support that actually is their testimony saying they are unaware of what action was taken. That's quite different than saying no action was taken. Many of their record references are either incorrect or based on incompetent summary judgment evidence, such as hearsay. The defendants filed objections timely to their summary judgment evidence, and that's found in the record at 770. I want to first address their equal protection claims against the individual defendants. They claim that Glenn Davis, the athletic director at this school, treated Kiana differently when he asked her to change her hair color. The record is uncontroverted that he had done so with Anglo students as well. The athletic policy manual required students to keep their hair in a natural color. It could not be dyed green, pink, burgundy, and purple. It's undisputed that her hair was highlighted in a burgundy, purplish color. She claims in her live complaint as well as her briefing that he admonished her for her, quote, micro braids. In her deposition, she testified that's not how her hair was. It was simply highlighted in an unnatural color. She and her mother both agreed that her hair violated the policy, but they felt that Glenn Davis didn't make other kids change their hair color. There are two student affidavits in the record, both from Anglo students, that their hair was required to be changed. AW had pink streaks in her hair. She was required to change it. And Dakota Goodwin had bleached his hair over the summer, as had many boys in a private football league. He told all the boys that they had to either recolor their hair back to a natural color or shave their head. There are testimony for the plaintiffs in their depositions where they did not know if Coach Davis had talked to other students. They claim that he made a comment about her hair being ethnic, which is disputed, but turns out to be irrelevant for this case because this court in Williams v. Bramer found that an isolated comment alone without more is not an equal protection violation. Additionally, in terms of Section 1983 liability to be imputed for the board, they would have to have knowledge that he made such comment. The plaintiffs never notified the board that they claimed that he said that. Instead, their grievance to the board said he, quote, badgered her about changing her hair color. That's at 2289 of the record. They do not mention ever that Coach Davis called her any kind of names or referred to her hair as ethnic. Regarding Coach Manley, they claim that equal protection violations for Kyra having missed the bus to a softball game She had been a starter all year. And that particular day, she was absent for three class periods. She checked out at lunch and never returned. Athletics was the last period of the day. And when they took roll at the beginning of class, as she always does, Kyra was not present. Other students in the class said Kyra checked out at lunch. We haven't seen her. Coach Manley had no reason to suspect she was going to return to school to go to the game. The bus loaded up during athletics period, as they normally do, and left after all students had been accounted for. Kyra did eventually show up for the game, late, having missed the bus. But the evidence shows that Coach Manley has left other Anglo students before who missed the bus. Other Anglo students who missed the bus also were not allowed to start when they arrived at the game tardy. So Kyra was not treated any differently than Coach Manley had treated other students. Additionally, Kyra admitted in her deposition that this particular incident was not racial in nature. She felt Coach Manley was treating her differently because she was upset that a previous incident involving another coach, Coach Smith, had gotten in trouble and been suspended for having called Kiana a, quote, bad influence for having had a baby out of wedlock. The other instance they claimed was equal protection violation were when they claimed that Coach Manley encouraged two students, who used to be Kiana's really close friends, encouraged them to press charges against Kiana after Kiana had threatened to beat them up. This was also following the Coach Smith incident, which is detailed more in the brief, which again, on that incident as well, they admit that that was not a racially charged incident. The claim about the pressing of charges against Kiana, the uncontroverted evidence is that Coach Manley did not tell them to file charges. When they complained they were afraid that Kiana was going to beat them up, she told them you need to speak with your parents, y'all need to decide whether this is something you need to press charges on or file a police report. This is up between you and your parents. She does acknowledge that she's never talked to students about doing such a thing before, but that's because this was the first time she ever had athletes under her supervision threaten physical violence against each other. Turning to the claims against the district, their Title VI and Equal Protection claims both require showing a deliberate indifference. Deliberate indifference, as the court knows, is a very high standard. It means the district cannot remain idle in the face of known harassment, and their response cannot be clearly unreasonable in light of the known circumstances. The record in this case shows that the district took action on each instance. The actions the district took were effective, and the district started initially addressing the individual perpetrators and then eventually addressed the entire student body holding a mandatory assembly. This case is very different than the Sixth Circuit and Second Circuit cases that talk about if a different perpetrator rises up and is harassing the same student, the district may need to take additional and different actions that it didn't take, that even though it took actions that were effective to the individual students previously, it may need to look at taking different actions later, and that did happen in this case. The district held a mandatory student-wide assembly. All students were required to attend. All faculty were required to attend. They consulted with the NAACP about who to bring in to hold this assembly. They brought in the Department of Justice to do it. They assigned a mentor to each of the Fennell plaintiffs for them to go to if they had any issues at school. They assigned a teacher specifically for Caven to walk with her between buildings to be an extra set of eyes and ears and to provide security and safety for her. The district was not idle to any instance that was reported to them. Specifically, the first instance that plaintiff's claim occurred was in the year 2000 when Kiana was in kindergarten. She admits that she only reported a kindergartner using the N-word to the bus driver. They do not recall reporting it to anybody else. After it was reported to the bus driver, they had no further problems until eight years later when Kiana, in 2008, heard the N-word used during class after they were reading Huckleberry Finn. Kiana and her mother both reported that incident to the teacher. The teacher immediately addressed the entire class, explained the context of Huckleberry Finn, and told them it was inappropriate to use that word. She had no further problems after reporting that in that classroom. It wasn't until two years later that she heard the N-word again at school. That was in 2010, and she heard the N-word used by student DP. She reported it to the principal. The principal counseled the student, issued him a warning, and called his mother. In their briefing, they say nothing was done, but this is another example of the testimony actually reflecting they don't know what was done. She did not have another problem at the school until two years later, which was in February 2012, when the noose in the parking lot was found. When that noose was found in the parking lot, the district immediately went out with the mom, looked at the car, pulled all their surveillance cameras, checked all the footage to see if they could tell who may have done it. They were unable to ascertain who did it. They called the police, got the police involved, handed over the investigation to the police, cooperated in the investigation, turned over the camera footage, gave complete access to the campus. Kiana eventually decided not to prosecute that claim. The claim then went to the FBI. The FBI investigated, and to this date, this case remains unsolved. We don't know who planted the noose. It was anybody affiliated with Marion ISD at all. After this incident, the district met with the NAACP, as I mentioned earlier, about referrals for getting additional training for its students and employees, and held the mandatory assembly. After that noose was found, they gave mentors to each kid to go to, allowed Kiana to park in a different parking lot, gave her access to the counseling office if she ever felt uncomfortable, and same with the lunch period. For Kyra, she only heard a racial taunt three times in nine school years. The first time was in 2008 in sixth grade, which was the text messages that Mr. Mattard mentioned. She got one text message from student JG. She reported that to the principal. When she got to school to confront JG, Kyra's friends started throwing candy at her, and the friends did not know about this racial taunting incident, so when the kids instigated the fight, JG turned and started throwing punches, and during the punching, they got sent to the principal's office, and they were both suspended for fighting. She had no further problems with JG. Same with student CB, who also texted a joke to her that referred to Obama using the N-word, reported to the principal. The principal counseled CB and suspended CB. She claims two years later that a teacher made a comment about blacks being on welfare. It's undisputed that she never reported that incident. In 2012, which was two years later, was when the parking lot noose was found. This is also when she claims that some of her former friends were posting comments on Facebook about her using the B-word, calling her a snitch. It was typical high school immaturity and cattiness that was not based on race. It actually had to do, going back to them having gotten Coach Smith in trouble earlier and those girls being upset about it. The younger student, Kaven, heard the N-word a total of three times in her years at middle school. The first time was in sixth grade. CH told a joke using the N-word. It was reported to the principal. The principal called the student's mother. She had no further problems with that student. And then again in sixth grade, based on hearsay, she heard a friend tell her that her friend heard these girls calling her black girl, and black girls weren't pretty enough to be cheerleaders. She reported that to the cheer sponsor as well as the principal. Principal Walters met with the cheerleaders, counseled them, and gave them warnings. And the cheer sponsor, according to Kaven, got after every single one of those girls. In their briefing, they say this was reported numerous times and that is not supported in the record. Wanda does not remember or recall reporting this name calling other than the one instance. But Ms. Walters testified they never reported it again after she met with the cheerleaders. The following school year is when she got in a fight with student A.M. And with that student, after the fight, or during the fight, she called her the N-word. They were both sent to the principal and A.M. was suspended. Kaven was also suspended, but after the principal investigated and found she acted in self-defense, he noted he changed her school record to reflect it was in self-defense. This is the only student she claims to have said the N-word after the suspension, but she never reported that A.M. used the N-word again. After that would have been the next school year in the fall of 2012, none of the plaintiffs report any racial incidents. It's not until the noose was found in February 2012. And after that was found, during that same week, a student spit at Kaven and asked, why don't you just move? She reported that to the principal. The principal called the student into the office. No further problems. And then also that same school year, she reports that D.P. was staring at her when she walked between buildings. And when that was reported to the principal, she immediately signed a teacher to walk with her to be the extra set of eyes and ears. There are two other instances that did not involve the plaintiffs. One was involving Doug Giles. In the spring of 2011, he found a shoelace in his locker. That he perceived to be shaped in the form of a noose. He immediately reported it to Coach Davis. Coach Davis called all the team in there that had been in the locker room at that time and demanded they give him names. No one would come forward, and as a consequence, he made them run laps. They eventually turned over a name to him. He investigated the name and discovered the student hadn't even been at school that day. And then in February 2012, around the time that noose was found, student J.E. used the N-word. Doug Giles got angry at that, threw a basketball in his face, and then they got in a fist fight. They were both suspended. And in the suspension, Principal Hernandez told J.E. that he was warned that he'll be suspended for using the N-word if he does it again, and that he was suspended for both fighting and using the N-word. It's very clear that the overall picture at the district was, it wasn't until 2000 that there was one incidence of racial name-calling. Eight years later, there were three instances involving two different plaintiffs. Both reported, all of them reported, all of them handled appropriately and not repeated. And then nothing happened again until two school years later, and that was when two instances were reported at the high school and three at the middle school, and it was less than a year later that the district took additional action above and beyond talking to the individual perpetrators and instituted the mandatory assembly and put in place the mentors and the teacher to walk Haven between classes. It is clear that the district did not act deliberately indifferent in this case. Therefore, we ask the Court affirm the summary judgment. Thank you, Ms. Gutierrez. Mr. Patard, you have five minutes on rebuttal. May it please the Court. There have been times I've gone to the carnival and played the game where you have to hit the gopher's head every time it pops up somewhere else. That's what this case is like, is that every time a gopher's head pops up, the district hits it, another gopher's head pops up again. But they're not killing the gophers. They're hitting the head of the gophers. They're not getting to the core of the problem. They're dealing with the symptoms. They're dealing with issues as they occur, rather than being proactive to deal with it, because this has gone on for a period of time. The question might be, what are additional remedial measures that they could have taken to address the culture in Marion? First, obviously, zero tolerance for racial harassment. Second, more stringent discipline for using racial epithets. Regardless of whether it was against plaintiffs or not, the use of racial epithets, in and of itself, is wrong. As an example, automatic in-school suspension, or expulsion or off-campus suspension for a second offense. Training directed at both teachers and students concerning harassment, sexual or racial, any type of harassment, because that deals with the core problem. Holding teachers responsible for student-on-student harassment in their classrooms. Holding teachers responsible when they give their tasks at approval or participate in the harassment. Those are the sorts of measures that need to be taken by the school district in order to be clearly reasonable in dealing with the problems. Effective measures are those that allow the students to enjoy the same educational opportunities as their classmates. Ineffective measures are those that don't. Each situation, obviously, is fact-specific. In this case, what the appellants allege is that the measures were ineffective, thus depriving the appellants of their educational opportunities the same as their white classmates. In reference to the individual appellees, Coach Manley, on the particular day where she left Keira behind, she had put out a note or a letter to all the members of the softball team that they would leave at 3.05. Keira was out that day because of an incident that had happened earlier that day with three other white classmates. And it upset her so that she asked her mother to request that she be allowed to sit out for a few hours to compose, to kind of decompress, to kind of get her head together, if you will, after having dealt with those three classmates in a different incident earlier that same day. So, yes, she was with some friends. They went and did some things. They went and got some ice cream, whatever. But they were on their way back to get there in time to go to the game when Manley decided that she was going to leave ten minutes early. What Keira said was that they were at a stop sign, they were honking and waving their arms to get Manley's attention, and Manley drove past them, ignoring them. Now, Manley says, oh, I didn't see anybody. I saw somebody over there, but I didn't see anybody waving at me or anything else. It's our contention that Coach Manley deliberately left her behind and that the times when she had done so with a white classmate was on a Saturday where there weren't specific time frames like there were for this situation after class. On Saturdays, you had to show up at 8 o'clock in order to go to a game. This was different. This was after school was over, at the end of class, and this was a different situation than the one that the FLE is using as they're showing legitimate nondiscriminatory reason. With Coach Davis and Coach Manley, the situation having to do with the investigation of the incident where Kiana confronted two of Keira's classmates, they had never, ever conducted an investigation like that before. Manley had never suggested to any classmates or any students that they should potentially file charges, and Davis characterized Kiana as a bully without talking to anybody other than Manley, and Coach Manley did not witness the incident herself. I see my time is up. I would like the court to reverse and remand the trial court's decision and to allow, again, the felons to go to trial on these issues. Thank you, sir.